UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| ROBERTA D. WINCHESTER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:12 CV 81 JAR / DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Roberta D. Winchester for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income under Title XVI of the Act, 42 U.S. C. § 1381, et seq.. The action was referred to the undersigned United States Magistrate Judge for review and recommended disposition under 28 U.S.C. § 636 (b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I. BACKGROUND**

Plaintiff Roberta D. Winchester, born on November 10, 1961, filed applications for Title II and Title XVI benefits on October 4, 2007. (Tr. 13, 76-78.) She alleged an onset date of disability of July 1, 2001 due to diabetes, osteoporosis, and breathing difficulties.[2] (Tr. 76, 80.) Plaintiff's applications were denied initially on December 1, 2007, and she requested a hearing before an ALJ. (Tr. 38, 31.)

On September 22, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 13-21.) On April 12, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 5-10.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. F.R.Civ.P. 25(d).

[2] Although her Social Security application indicates an alleged onset date of October 1, 2006, during the ALJ hearing, plaintiff confirmed an alleged onset date of July 1, 2001. (Tr. 80, 214.)

## II. MEDICAL HISTORY

On April 28, 2004, plaintiff went to the Twin Rivers hospital and underwent testing to determine her bone density. The treating physician noted improving borderline osteopenia of the hip with a slightly increased risk of fracture.[3] (Tr. 121-22.)

On August 25, 2004, plaintiff went to Twin Rivers and complained of fatigue and pain in her knees and back. X-rays of her left knee and the thoracic and lumbar regions of her spine revealed widespread but minimal signs of degenerative disc disease in the lumbar region.[4] Results from a knee exam showed no fractures, dislocations, or significant degenerative changes. A Doppler echocardiography revealed no significant abnormalities, but noted a mild prolapse of the anterior mitral valve leaflet, mitral regurgitation, and mild tricuspid regurgitation.[5] (Tr. 123-29.)

On February 7, 2006, plaintiff visited Gideon Medical Clinic and reported coughing, nasal congestion, headaches, diarrhea, and pain in her right lung. On February 10, 2006, she complained of shortness of breath and right side pain. A chest scan revealed no active pulmonary disease, but George Ladyman, M.D., found what he believed to be a small granuloma in the right upper lung.[6] (Tr. 135, 130-31.)

---

[3] Osteopenia is decreased calcification or density of the bone. Stedman's Medical Dictionary, 1391 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman's"). It is not as severe as osteoporosis. WebMD, http://webmd.com/a-to-z-guides/tc/osteopenia-overview (last visited January 29, 2013).

[4] The thorax is the upper part of the trunk between the neck and the abdomen. Stedman's at 1982. The lumbar relates to the part of the back and sides between the ribs and the pelvis. Stedman's at 1121. Degenerative disc disease, while not actually a disease, is a term used to describe the normal changes in spinal discs that accompany aging. WebMD, http://www.webmd/back-pain/tc/degenerative-disk-disease-topic-overview (last visited January 25, 2013).

[5] An echocardiography is the use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions. Stedman's at 608. A prolapsed anterior mitral valve leaflet is a sinking of the front surface mitral containing phospholipid. Stedman's at 100, 1573, and 1487. A mitral regurgitation is backward, incompetent flow of blood through the mitral valve and a tricuspid regurgitation is a backward, incompetent flow of blood through the tricuspid valve. Stedman's at 1668.

[6] A granuloma is a nodular inflammatory lesion. Stedman's at 831.

On November 30, 2006, plaintiff complained of coughing and congestion. Timothy W. McPherson, Ph.D, of Gideon Medical Clinic diagnosed Type II diabetes mellitus and peripheral neuropathy.[7] Dr. McPherson also prescribed Avandia.[8] (Tr. 131, 135, 149.)

On February 14, 2007, plaintiff visited Gideon Medical Clinic and reported neck and back pain. She was diagnosed with sinusitis, osteoporosis, and an allergic reaction and prescribed Histuss.[9] (Tr. 150-51.)

On April 11, 2007, plaintiff complained of a runny nose, coughing, and pain in her right side. She received diagnoses for sinusitis, dysuria, and Type II diabetes.[10] She also underwent a blood panel, which revealed an iron deficiency, and received a Feosol prescription.[11] (Tr. 152-55.)

On May 15, 2007, plaintiff was diagnosed with acute anemia. She returned for her anemia on June 25, 2007 and was advised to continue her Feosol prescription and increase the iron in her diet. (Tr. 156-59.)

On August 2, 2007, Rebecca Lamar, S.D.M., performed an eye examination. This revealed 20/20 unaided vision of plaintiff's right eye and 20/200 unaided vision of plaintiff's left eye. Plaintiff has 20/20 aided vision of both her right and left eyes. In addition, it detected slight cataracts and dry eyes but no diabetic retinopathy.[12] (Tr. 172.)

---

[7] Diabetes mellitus typically includes symptoms of excessive urination, weight loss, and significant glucosuria. Type II diabetes is adult-onset diabetes. Stedman's at 528. Osteoporosis is an age-related disorder that results in the reduction in the quantity of bone or skeletal tissue. Stedman's at 1391. Chronic obstructive pulmonary disease (COPD) is a lung disease usually caused by smoking that makes it hard to breathe. WebMD, http://www.webmd.com/drugs/ (last visited January 25, 2013). Peripheral neuropathy is a disorder affecting the peripheral nervous system. Stedman's at 1313.

[8] Avandia is an anti-diabetic drug used to control high blood sugar in Type II diabetics. WebMD, http://www.webmd.com/drugs (last visited January 29, 2013).

[9] Sinusitis is inflammation of the mucous membrane of any sinus, especially the paranasal. Stedman's at 1777. Histuss treats allergies, hay fever, and the common cold. WebMD, http://www.webmd.com/drugs (last visited January 29, 2013).

[10] Dysuria is difficulty or pain in urination. WebMD, http://www.webmd.com/drugs (last visited January 29, 2013).

[11] Feosol is an iron supplement used to treat or prevent low iron levels in the blood. WebMD, http://www.webmd.com/drugs (last visited January 29, 2013).

[12] Retinopathy is a noninflammatory degenerative disease of the retina. Stedman's at 1683.

On August 8, 2007, plaintiff visited Dr. McPherson for follow-up lab work which revealed anemia, chest pain, dyslipidemia, and chronic obstructive pulmonary disease. The treating physician prescribed her Zantac and Mevacor.[13] (Tr. 161.)

On September 5, 2007, plaintiff returned to Gideon Medical Clinic and complained of nerves and hair loss. On September 19, 2007, plaintiff visited for a follow up on her test results, which revealed gastroesophageal reflux disease, osteoporosis, anxiety, and Type II diabetes.[14] (Tr. 164, 167-68.)

On November 11, 2007, plaintiff underwent a bone density scan. The test results revealed normal bone density and no significantly increased risk for fractures. (Tr. 133.)

On July 21, 2009, plaintiff was diagnosed with diabetes and COPD and received Albuterol and Ipratropium Bromide prescriptions.[15] She also received a Ranitidine prescription for her stomach acid. (Tr. 177-80.)

On August 11, 2009, plaintiff received prescriptions of Hydroxyzine for her anxiety and Ferrous Sulfate for her anemia. On October 27, 2009, plaintiff received a Buspirone prescription for her nerves. (Tr. 175-85.)

On March 19, 2010, Price Gholson, Psy. D., a psychologist at the Counseling Center, L.L.C., conducted a psychological examination of plaintiff. He noted plaintiff's reported appetite loss, difficulty sleeping, frequent sad moods, low energy, feelings of hopelessness, loss of interest in activities, isolation, and frequent crying. (Tr. 189-90).

Dr. Gholson determined that plaintiff had lower than average facial expressions and eye contact, present expression of emotions, and mood. He also noted a very high presence of depressive trends. In addition, he reported plaintiff had a lower than average remote memory, ability to state serial sevens from the number 100, action to change, and goal striving. (Tr. 193.)

Dr. Gholson diagnosed her with panic disorder, agoraphobia, major depressive disorder, stomach problems, COPD, diabetes, anemia, and osteoporosis. He stated she

---

[13] Mevacor lowers bad cholesterol and fats and raises good cholesterol in the blood. WebMD, http://www.webmd.com/drugs (last visited January 29, 2013).

[14] Gastroesophogeal reflux disease is acid reflux in the stomach and esophagus. Stedman's at 792.

[15] Albuterol treats COPD and Ipratropium Bromide treats runny noses. WebMD, http://www.webmd.com/drugs (last visited on January 25, 2013).

had problems with occupation, finances, and access to health care. He gave her a GAF score of 50 and recommended approval for access to health care.[16] (Tr. 194.)

On August 27, 2010, Paul W. Rexroat, Ph.D., performed a post-hearing[17] consultative psychological examination of plaintiff. Plaintiff reported to Dr. Rexroat her frequent feelings of depression and lack of energy. She stated that she frequently cries but denied any suicide attempts, homicidal ideations, paranoia, or delusions. However, she revealed that she frequently hears two or three people whispering and reported difficulty sleeping. She reported a normal appetite. (Tr. 196.)

Dr. Rexroat also conducted a mental status examination. He reported she was nicely dressed, did not act suspicious, did appear slightly anxious and tense, cried, was not tremulous or shaky, was alert and cooperative, used normal, coherent and relevant speech, and had no flight of ideas or other abnormality of speech that would indicate thought disorder. (Id.) He also evaluated her cognitive functioning. In this regard he found she was well oriented in time, person, place, and situation. She had good memory for past events; she displayed immediate memory and delayed memory; she demonstrated correct judgment; she performed basic mathematical operations; and she demonstrated abstract verbal reasoning. (Id.) He then stated that she appeared to be functioning in the low average range of intelligence. From her subjective description of her circumstances, Dr. Rexroat found that she described "significant symptoms of major depression with psychotic features and of panic disorder." (Id.)

Dr. Rexroat found that plaintiff suffered from moderate limitations in her social functioning. He further found that she had low average range of intelligence and that she could sustain concentration, persistence, and pace with simple tasks. (Id.)

He diagnosed her with major and recurrent depression with psychotic features and panic disorder without agoraphobia. He stated she had the ability to manage her own funds and he gave plaintiff a GAF score of 49. (Tr. 198.)

---

[16] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

[17] On May 17, 2010, plaintiff received her evidentiary hearing before an administrative law judge.

On August 30, 2010, Dr. Rexroat submitted a Medical Source Statement of Ability to do Work-Related Activities (Mental) regarding plaintiff. He found that plaintiff's impairments did not affect her ability to understand, remember, and carry out instructions and that her intelligence was in the low average range. He also found marked restriction regarding her ability to interact appropriately with the general public and to respond appropriately to usual work situations and changes in work routine. Additionally, he found moderate restriction regarding her ability to interact appropriately with supervisors and coworkers. He attributed plaintiff's restrictions to her major depressive disorder and panic disorder. (Tr. 199-201.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on May 17, 2010. Plaintiff testified to the following. Her sister-in-law drove her to the hearing. She is 48 years old, has been married for 33 years, and has two adult children. She lives in a one-story house with her husband. She is five feet, three inches and weighs 108 pounds. She has lost a couple of pounds in the past six months but does not know to what this is attributable. (Tr. 206-47.)

Her income consists solely of food stamps, energy assistance, and her husband's social security. Plaintiff recently began receiving Missouri Health Net health insurance after a lapse in coverage, which lasted two or three years. (Tr. 212.)

Plaintiff finished the seventh grade but has not obtained her GED. She can read and write. (Tr. 213.)

Plaintiff last worked for one month in or around 2009. She worked as a dishwasher at a restaurant, Daily Bread, for thirty-one hours each week until she felt too sick to continue. During her time at Daily Bread, her blood sugar repeatedly dropped and caused her to faint. She also overheated and lost her breath when coworkers mopped with bleach and other cleaners. She worked alongside others in the kitchen but had very little interaction with the public. (Tr. 213-14, 231.)

She explained her choice of July 1, 2001 as the onset date of disability, stating that she became a diabetic, had a hole in her right lung, and had less energy. (Tr. 214.)

From 1995 to 2001, plaintiff worked at a picture frame factory. In her position, she cut wood to make frames and nailed them together. At times, she lifted up to fifty pounds of lumber. (Tr. 214.)

During the past fifteen years, plaintiff has worked only at the picture frame factory and restaurant and has not applied for any other positions. Due to her health, she fears she will not be able to continue working if she is hired. (Tr. 215.)

On a typical day, plaintiff wakes up around 6:30 or 7:00, makes her bed, and gets dressed. She does not have difficulty bathing. She watches television, waters her flowers, and helps with any cleaning she can. Her husband vacuums, mops, and sweeps. With assistance from her husband, she cooks and does the laundry. The laundry is her most difficult chore because it forces her to bend down, grab clothes, and lift them over the dryer. She explained that doing the dishes and laundry makes her more tired than other chores. In addition, she grocery shops with her husband or daughter but can only carry one bag at a time. Plaintiff does not argue with anyone while in the grocery store. She drives a car about ten miles each week. Plaintiff also pays the household bills. (Tr. 212, 216-18, 229.)

Plaintiff spends the majority of her days watching television, walking around the house, helping with chores, and occasionally looking at her garden. She waters her flowers but does not plant or weed them. Plaintiff does not read the newspaper and is no longer interested in reading. (Tr. 212, 216-18, 229.)

Plaintiff socializes only with her family and does not participate in any organizations. During the evenings and weekends, she remains at home and her family visits her. She gets along with her neighbors and sometimes gets along with her family. Plaintiff previously enjoyed crocheting, but stopped because she thinks she has arthritis. She does not walk outside and has not visited a park in a long time. She previously fished and camped but ceased both activities when she stopped working. (Tr. 217-19.)

Plaintiff does not drink but smokes about ten cigarettes each day. She previously smoked more cigarettes on a daily basis. She has unsuccessfully tried to quit smoking for the past five years and has been instructed by her doctors to quit. (Tr. 219, 229-30.)

Plaintiff uses an Albuterol inhaler four times each day to improve her breathing. She places two medicine tubes in a breathing cup, closes them, and pushes a button to start an attached machine. The breathing cup then releases a mist into her mouth. Each treatment lasts about fifteen or twenty minutes. Plaintiff completes these treatments at 8:00 a.m., 12:00 p.m., 4:00 p.m., and 8:00 p.m. She has had breathing difficulties since developing a hole in her right lung. Doctors did not fix the hole but instead decided to let it heal on its own. Dust, strong winds, spray air fresheners, and household cleaners aggravate her breathing. Plaintiff smokes despite her breathing problems and described it as a bad habit. (Tr. 220-21, 230-32.)

Plaintiff takes two Hydroxyzine pills daily for her anxiety. She first reported that it alleviates her symptoms and later reported that she is unsure of how it is affecting her because she only recently began taking it. Plaintiff takes Buspirone for her nerves and reported that it successfully calms her. She also takes ferrous sulphate, an iron pill, to improve her anemia. Plaintiff takes Zantac to alleviate her acid reflux. In addition, she takes a Singulair pill for her breathing and Paxil each night for her depression. She had not taken Paxil long enough to attest to its effectiveness. Plaintiff also takes Gabapentin to help her sleep, which she often finds difficult because of the aches and pains in her legs and feet. She could not remember the name of her allergy pill. She believed that she is allergic to, among many things, chemicals, sprays, and dust. She has not yet been tested for allergies. Some of her medications, such as Paxil, make her sleepy and tired. (Tr. 221-24.)

She has osteoporosis but has not broken any bones as an adult. She previously took calcium to help treat her osteoporosis, but stopped because her doctor has not instructed her that she should continue taking them. Although she has diabetes, she does not take any medications for it. Instead, she tries to monitor her sugar intake. She developed diabetes in 2000 or 2001. She previously received medication for diabetes but stopped following the loss of health insurance. (Tr. 224-25.)

Plaintiff aches all of the time but is unsure of what causes it. Her memory is not as good as before, and she has to write something down, stick it on a wall, and look at it every day in order to remember it. She also frequently develops colds in the winter. (Tr. 225-26, 233.)

She cries about once per week and has about one anxiety attack per month. Her anxiety medication does not always affect her, but it still helps. She has had two such attacks since beginning her anxiety medication, but she has not had a major panic attack since she stopped working. Plaintiff has never been in a mental hospital and receives no psychiatric care. However, she plans to see a psychiatrist in one month. She has considered suicide a couple of times but has not actively tried to kill herself. (Tr. 226-27, 230.)

Her concentration is fleeting. Her back hurts when she sits in a chair, and she can stand only for about twenty or thirty minutes. She can walk only one block and lift only thirty or thirty-five pounds. Bending, stooping, crouching, kneeling, and crawling cause her pain, which she attributes to osteoporosis. She also has difficulty climbing more than a couple of steps. (Tr. 228.)

Vocational expert (VE) Vincent Stock also testified at the hearing. The VE testified that plaintiff worked as a factory laborer, which entailed medium exertion. (Tr. 234.)

The ALJ posed a hypothetical question concerning an individual with plaintiff's age and work experience. The individual could perform light work, including lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently. The individual could also sit, stand, and walk for six hours during an eight-hour workday and push or pull for eight hours during an eight-hour workday. In addition, the individual must avoid exposure to dusts, fumes, gases, and chemicals. The VE responded that such individual could not perform plaintiff's past relevant work, which was greater than light exertion. The VE also stated that the individual could work as a packer or mailer, which is light work and has 320,000 positions nationally and 8,000 in Missouri. In addition, the individual could work as an assembler, which is light work and has 240,000 positions nationally and 6,000 in Missouri. (Tr. 235.)

The ALJ altered the hypothetical individual by requiring that the individual avoid exposure to additional occupational hazards. The VE responded that the individual still could not perform plaintiff's past relevant work. The VE stated that such an individual could work as an airline security representative, which is light work, or as a flagger, which is light work. An airline security representative has 80,000 positions nationally, 2,000 in Missouri, and about 15 in the Cape Girardeau region. A flagger has 120,000 positions nationally and 3,000 in Missouri. He further added that these two positions are representative, and not exhaustive, examples. (Tr. 236.)

In response to questions by plaintiff's counsel, the VE stated that an individual that has to miss four days of work per month due to medical conditions would be precluded from the previously-mentioned jobs. In addition, individuals requiring breaks in excess of the normal allotment would also be precluded. Further, the VE conceded that if such individual could not work with coworkers, she could not be employed as an airline security representative. (Tr.237-38.)

### III. DECISION OF THE ALJ

On September 22, 2010, the ALJ issued a decision that plaintiff was not disabled at any time up to the date of his decision. At Step One of the prescribed regulatory decision-making scheme,[18] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, July 1, 2001. At Step Two, without stating whether

---

[18] See below for explanation.

they were severe, the ALJ found that plaintiff suffered from diabetes mellitus, COPD controlled by medication, and isolated incidents of anxiety and depression. (Tr. 20.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and determined that plaintiff has the residual functional capacity to perform the physical exertional and nonexertional requirements of light work with the exception of lifting or carrying more than ten pounds frequently or more than twenty pounds occasionally; or having concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants. He concluded there are no credible, medically-established mental or other nonexertional limitations. (Tr. 17, 20.)

At Step Four, the ALJ determined plaintiff was unable to perform any past relevant work. (Tr. 20.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 21.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v.

Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

### III. DISCUSSION

Plaintiff argues the ALJ erred by finding her capable of performing jobs existing in significant numbers in the national economy. Specifically, she argues that substantial evidence does not support the RFC determination regarding her mental conditions. Residual functional capacity is the ability of a claimant "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Willcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2001). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ found plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms not credible. The ALJ emphasized the lack of medical records to sustain plaintiff's allegations. "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). The record does not show a long, clear, and detailed pattern of anxiety or depression. Plaintiff conceded that her medical records are "sporadic." (Doc. 15 at 8.) Plaintiff did not complain of "nerves" to her doctor until September 5, 2007, after she applied for disability benefits. (Tr. 161.) Plaintiff has submitted no medical records for the periods September 2004 through January 2006 and December 2007 through July 2009. While plaintiff had no medical insurance from about

2007 or 2008 until 2010 (Tr. 225), she did not receive consistent medical treatment even while insured. Also, the ALJ observed at the hearing that plaintiff did not display any obvious signs of depression, anxiety, memory loss, or other mental disturbance. (Tr. 19.) Pursuant to Social Security Ruling ("SSR") 96-7p, the ALJ is permitted to "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." See SSR 96-7p; see also Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001). The aforementioned inconsistencies in the record and the ALJ's recorded observations sufficiently support the ALJ's decision to discount plaintiff's allegations.

Plaintiff also argues that the opinions of Dr. Gholson and Dr. Rexroat are entitled to controlling weight. But the opinion of a consulting physician based upon a single examination generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ considered the opinions of Dr. Gholson and Dr. Rexroat. Both doctors performed one-time, independent evaluations and recommended plaintiff receive disability benefits. Dr. Rexroat's psychosis diagnosis is not supported by any explanation or corroborated by any of plaintiff's treating physicians, and it appears to be inconsistent with his underlying findings regarding plaintiff's mental status, cognitive findings, and functional limitations. (Tr. 196-97.) Dr. Gholson based his evaluation on plaintiff's self-reported symptoms that are not substantiated by her medical record. (Tr. 190.) Further, Dr. Gholson and Dr. Rexroat provide the only opinions of any physicians in the record that impose limitations on plaintiff's ability to perform work-related activities due to a medical condition. Therefore, the ALJ properly disregarded Dr. Gholson's and Dr. Rexroat's opinions.

Plaintiff argues that she does not have the RFC for performing the work described by the vocational expert. "It is the claimant's burden . . . to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). As discussed above, the ALJ properly discounted plaintiff's subjective complaints and the opinions of Dr. Gholson and Dr. Rexroat. The ALJ determined that nothing in the record precluded plaintiff from performing light work not requiring concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, or other irritants. (Tr. 17.) Also, the ALJ noted that any restriction in plaintiff's physical activities is a result of her own choice rather than any medical limitations. (Tr. 18.) Accordingly, plaintiff's argument that the ALJ erred in her RFC determination is without merit.

Substantial evidence also supports the ALJ's Step Five finding. "[A] disabling impairment must be sufficiently severe to preclude not only past work but all substantial

gainful work 'which exists in significant numbers' in the plaintiff's region or 'in several regions of the country.'" 42 U.S.C. § 423(d)(2)(A). The ALJ properly relied on the VE's testimony to find that plaintiff can perform light work and, in particular, jobs that exist in significant numbers in the national and state economies. Accordingly, the ALJ satisfied her burden of identifying other jobs that plaintiff can perform with her impairments. See Kirskey v. Heckler, 808 F.2d 690, 692-94 (8th Cir. 1987).

Substantial evidence supports the RFC determination and the ALJ's resulting Step Five conclusion.

## IV. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the final decision of the Commissioner of Social Security be affirmed under Section 4 of 42 U.S.C. § 405 (g). The failure to file timely documentary objections may waive the right to appeal issues of fact.

/S/   David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 8, 2013.